COURT OF APPEALS

                                                 SECOND
DISTRICT OF TEXAS

                                                                FORT
WORTH

 

 

                                       NOS.
2-05-473-CR

        2-05-474-CR

 

 

CRAIG MITCHELL STAGGS                                                   APPELLANT

 

                                                   V.

 

THE STATE OF TEXAS                                                                STATE

 

                                              ------------

 

        FROM
CRIMINAL DISTRICT COURT NO. 4 OF TARRANT COUNTY

 

                                              ------------

 

                                MEMORANDUM
OPINION[1]

 

                                              ------------

In three points, appellant
Craig Mitchell Staggs appeals his convictions for aggravated sexual assault of
a child, indecency with a child, and bail jumping.[2]  We affirm.








BACKGROUND

Appellant was indicted and
tried on four counts of aggravated sexual assault of a child and two counts of
indecency with a child.  After a
mistrial, he was retried in September 2005 on three counts of aggravated sexual
assault of a child, two counts of indecency, and one count of bail jumping.[3]  He pled not guilty to all of the charges and
true to a repeat offender allegation based on a prior conviction in Florida for
attempted sexual battery.  The jury found
him guilty of all charges.  The judge
sentenced him to confinement: thirty years for each of the aggravated sexual
assault counts, twenty years for each of the indecency counts, and five years
for bail jumping, with all three sentences to run concurrently.  We will discuss the facts of this case with
regard to each point on appeal.

LEGAL & FACTUAL
SUFFICIENCY

In his first two points,
Appellant complains that the evidence was legally and factually insufficient to
support his conviction for bail jumping.

 

 








Standard Of Review

In reviewing the legal
sufficiency of the evidence to support a conviction, we view all the evidence
in the light most favorable to the verdict in order to determine whether any
rational trier of fact could have found the essential elements of the crime beyond
a reasonable doubt.  Jackson v.
Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); Hampton v.
State, 165 S.W.3d 691, 693 (Tex. Crim. App. 2005).  This standard gives full play to the
responsibility of the trier of fact to resolve conflicts in the testimony, to
weigh the evidence, and to draw reasonable inferences from basic facts to
ultimate facts.  Jackson, 443 U.S.
at 319, 99 S. Ct. at 2789.  The trier of
fact is the sole judge of the weight and credibility of the evidence.  See Tex.
Code Crim. Proc. Ann. art. 38.04 (Vernon 1979); Margraves v. State,
34 S.W.3d 912, 919 (Tex. Crim. App. 2000). 
Thus, when performing a legal sufficiency review, we may not re‑evaluate
the weight and credibility of the evidence and substitute our judgment for that
of the fact‑finder.  Dewberry v.
State, 4 S.W.3d 735, 740 (Tex. Crim. App. 1999), cert. denied, 529
U.S. 1131 (2000).  We must resolve any
inconsistencies in the evidence in favor of the verdict.  Curry v. State, 30 S.W.3d 394, 406
(Tex. Crim. App. 2000).








The sufficiency of the
evidence should be measured by the elements of the offense as defined by the
hypothetically correct jury charge for the case.  Malik v. State, 953 S.W.2d 234, 240
(Tex. Crim. App. 1997); Bowden v. State, 166 S.W.3d 466, 470 (Tex. App.CFort Worth 2005, pet. ref=d).  Such a charge would be one
that accurately sets out the law, is authorized by the indictment, does not
unnecessarily restrict the State=s theories of liability, and adequately describes the particular
offense for which the defendant was tried. Gollihar v. State, 46 S.W.3d
243, 253 (Tex. Crim. App. 2001); Malik, 953 S.W.2d at 240.  The law as authorized by the indictment means
the statutory elements of the charged offense as modified by the charging
instrument.  See Curry, 30 S.W.3d
at 404.








When reviewing the factual
sufficiency of the evidence to support a conviction, we view all the evidence
in a neutral light, favoring neither party. 
Watson v. State, 204 S.W.3d 404, 414 (Tex. Crim. App. 2006); Drichas
v. State, 175 S.W.3d 795, 799 (Tex. Crim. App. 2005).  We then ask whether the evidence supporting
the conviction, although legally sufficient, is nevertheless so weak that the
fact‑finder=s
determination is clearly wrong and manifestly unjust or whether conflicting
evidence so greatly outweighs the evidence supporting the conviction that the
fact‑finder=s
determination is manifestly unjust.  Watson,
204 S.W.3d at 414‑15, 417; Johnson v. State, 23 S.W.3d 1, 11 (Tex.
Crim. App. 2000).  To reverse under the
second ground, we must determine, with some objective basis in the record, that
the great weight and preponderance of all the evidence, though legally
sufficient, contradicts the verdict.  Watson,
204 S.W.3d at 417.

In determining whether the
evidence is factually insufficient to support a conviction that is nevertheless
supported by legally sufficient evidence, it is not enough that this court Aharbor a subjective level of reasonable doubt to overturn [the]
conviction.@  Id. 
We cannot conclude that a conviction is clearly wrong or manifestly
unjust simply because we would have decided differently than the jury or
because we disagree with the jury=s resolution of a conflict in the evidence.  Id. 
We may not simply substitute our judgment for the fact‑finder=s.  Johnson, 23 S.W.3d at
12; Cain v. State, 958 S.W.2d 404, 407 (Tex. Crim. App. 1997).  Unless the record clearly reveals that a
different result is appropriate, we must defer to the jury=s determination of the weight to be given contradictory testimonial
evidence because resolution of the conflict Aoften turns on an evaluation of credibility and demeanor, and those
jurors were in attendance when the testimony was delivered.@  Johnson, 23 S.W.3d at
8.  Thus, we must give due deference to
the fact‑finder=s
determinations, Aparticularly
those determinations concerning the weight and credibility of the evidence.@  Id. at 9.

 

 








Failure To Appear

Appellant complains that the
evidence was not legally and factually sufficient to convict him of bail
jumping because the clerk of the court at trial was unable to find any
documentation indicating that Appellant had been notified of the March 29, 2005
court date alleged in the indictment and nothing in the trial docket indicated
that he was supposed to appear on March 29, 2005.

A person commits the offense
of bail jumping if he has been lawfully released from custody with bail on the
condition that he subsequently appear and then he intentionally or knowingly
fails to appear in accordance with the terms of his release.  See Tex.
Penal Code Ann. '
38.10(a).  It is a defense to prosecution
for this offense if the actor had a reasonable excuse for his failure to
appear.  See id. ' 38.10(c).








A copy of Appellant=s bond agreement pertaining to the aggravated sexual assault and
indecency charges was admitted into evidence at trial.  On its face, the bond agreement states AAppearance Bond Instanter,@ and it requires Appellant=s appearance Ainstanter
before the court . . . and there remain from day to day and from term to term
of said court, until discharged by due process of law . . . .@  This language in the bond
agreement directed Appellant to appear instanter in the trial court, and it
constituted a prima facie showing that Appellant had notice of the proceedings
at which he failed to appear.  See
Euziere v. State, 648 S.W.2d 700, 702 (Tex. Crim. App. 1983) (stating that
wording in a bond directing defendant to appear instanter provided him with
sufficient and proper notice; no evidence was presented to the contrary); Richardson
v. State, 699 S.W.2d 235, 238 (Tex. App.CAustin 1985, pet. ref=d) (holding that evidence presented to show defendant had no actual
notice was sufficient to defeat prima facie showing; defendant, his wife, and
his bondsman testified that they received no notice, and court coordinator
testified that no effort was made to notify defendant of the hearing).  The prima facie showing satisfies the State=s burden of proving a culpable mental state in the absence of any
evidence to the contrary.  See Burns
v. State, 958 S.W.2d 483, 488 (Tex. App.CHouston [14th Dist.] 1997, no pet.); Richardson, 699 S.W.2d at
238.








Because it was shown during
trial that Appellant had been released on an instanter bond, Appellant had to
bring forth evidence that he did not receive actual notice.  See Richardson, 699 S.W.2d at
238.  Only if there was some proof that
Appellant did not have actual notice did the State then have to produce
evidence sufficient to justify a rational trier of fact in finding either that
Appellant did have actual notice or that he engaged in a course of conduct
designed to prevent him from receiving notice.  See Etchison v. State, 880 S.W.2d 191,
192 (Tex. App.CTexarkana
1994, no pet.); Richardson, 699 S.W.2d at 238.

Appellant contends that the
absence of a notation on the docket sheet that the case was set for any type of
hearing or docket on March 29, 2005, was sufficient to overcome the instanter
bond=s prima facie proof.  He also
argues that the prima facie showing was overcome by the court clerk=s testimony that the records indicated that he had been notified to
appear in court for trial on April 4, 2005, and for a pretrial hearing on March
16, 2005, but that nothing in the records indicated that he had been notified
to appear in court on March 29, 2005. 
Assuming arguendo that this was sufficient evidence to defeat the
instanter bond=s prima
facie showing and to shift the burden back to the State, we review the evidence
presented at trial to determine whether it was legally and factually sufficient
for the jury to conclude that Appellant did have actual notice or that he
engaged in a course of conduct designed to prevent him from receiving
notice.  See Richardson, 699
S.W.2d at 238.








Charlotte Crow, the court
clerk, testified that Appellant=s trial was set for March 29, 2005, and that Appellant did not appear
that day and his bond was Aheld insufficient.@  When asked whether she had a
copy of the trial setting notice that was to be sent to the Appellant=s trial attorney, Crow checked the file and then testified that it did
not appear to be in the file, but that Awe don=t typically
leave a copy of the setting notice in the file itself unless it is returned due
to change of address.@[4]  The trial docket shows a
notation that Appellant=s bond was
held insufficient on March 29, 2005, and that a warrant was issued. Crow did
testify that there was a setting notice sent out for an April 4 trial date and
for a March 16 hearing date, but she also testified that her records indicated
that Appellant had a court setting on March 29. 
The State=s attorney
asked Crow whether, if April 4 were the correct date, Appellant would have been
required to show up that day as well, even if he was out of the country. Crow
replied, AThat=s correct.@  The trial court granted without objection the
State=s request that it take judicial notice that Appellant=s trial on the aggravated sexual assault and indecency charges had
been set for March 29, 2005.








An official from the Department
of Homeland Security (ADHS@), Immigration Customs Enforcement division, testified that he
arrested Appellant on April 7, 2005, at Chicago O=Hare International Airport.  The
official testified that he intercepted Appellant on Appellant=s return flight from Bombay, India, and that Appellant did not resist
arrest when he was informed that there was a warrant from Texas for his arrest.[5]  The official testified that Appellant
admitted that he had driven from Fort Worth to Chicago.

Appellant did not testify at
trial.  Appellant=s wife, Mainaz Staggs, testified that Appellant went to India because
he was afraid,[6]
and that when he landed in India, he tried to get a return ticket immediately,
but that it was around seven days later before he could get a return
flight.  She testified that if he had
been able to get a return flight immediately, that he would have been back
before April 4.








The trial court instructed
the jury that they were not required to accept the judicially-noticed trial
date as conclusive.[7]  Without reaching the issue of whether
judicial notice was appropriate under these circumstances,[8]
we conclude that the evidence presented at trial was both legally and factually
sufficient for the jury to find that Appellant intentionally or knowingly
failed to appear in accordance with his bond agreement either because he did
not overcome the presumption that he received actual notice or because the
State met its burden to show that he either did receive actual notice or
engaged in a course of conduct designed to prevent him from receiving
notice.  See Richardson, 699
S.W.2d at 238.

Viewing the evidence in the
light most favorable to the verdict and resolving any inconsistencies in its
favor, the jury could have disregarded the absence of a ATrial Docket@ notation on
the docket sheet for March 29, 2005, when no explanation was given at trial as
to the notation=s
meaning.  The jury could have chosen to
believe Crow=s testimony
that her records indicated that Appellant had a court setting on March 29 and
that the absence of a copy of the trial setting notice sent to Appellant=s attorney proved that it actually was delivered, based on her
explanation that such copies typically were not left in the file unless
returned due to change of address.













The jury could have chosen to
believe that Appellant had engaged in a course of conduct designed to prevent
him from receiving notice by fleeing to India, based on the DHS official=s testimony about arresting Appellant on April 7 at Chicago O=Hare International Airport, Crow=s testimony about April 4 as a trial setting,[9]
and Mainaz=s testimony
that Appellant did go to India and that it was a week before he could get a return
flight.  The jury could have chosen to
disbelieve her testimony that Appellant would have been back before April 4 if
he had been able to get an earlier return flight.  See Jackson, 443 U.S. at 319, 99 S.
Ct. at 2789; Margraves, 34 S.W.3d at 919; Curry, 30 S.W.3d at
406.  Reviewing all of the evidence in a
neutral light and giving due deference to the jury=s determination, we reach the same conclusion as to factual
sufficiency because we cannot say, on these facts, that the jury=s determination that Appellant committed the offense of bail jumping
was clearly wrong or manifestly unjust.  See
Watson, 204 S.W.3d at 414-15, 417. 
We overrule Appellant=s first two points.[10]

JURY INSTRUCTION

In his third point, Appellant
complains that the trial court erred by instructing the jury that they could
consider evidence of extraneous offenses allegedly committed by Appellant in Adetermining the credibility of the defendant in connection with the
offense@ because Appellant did not testify.     Appellate
review of error in a jury charge involves a two‑step process.  Abdnor v. State, 871 S.W.2d 726, 731
(Tex. Crim. App. 1994).  Initially, we
must determine whether error occurred. 
If so, we must then evaluate whether sufficient harm resulted from the
error to require reversal.  Id. at
731‑32.

Presence Of Error








If there is error in the
court=s charge but the appellant did not object to it at trial, we must
decide whether the error was so egregious and created such harm that the
appellant did not have a fair and impartial trialCin short, that Aegregious
harm@ has occurred.  Almanza v.
State, 686 S.W.2d 157, 171 (Tex. Crim. App. 1985) (op. on reh=g); see Tex. Code Crim.
Proc. Ann. art. 36.19 (Vernon 2006); Hutch v. State, 922 S.W.2d
166, 171 (Tex. Crim. App. 1996). It is undisputed that Appellant did not object
to the contested jury instruction at trial.

The trial court charged the
jury with the following instruction:

You
are instructed that if there is any testimony before you in this case regarding
[Appellant=s]
having committed an offense other than the offense alleged against him in the
indictment in this case, you cannot consider said testimony for any purpose
unless you find and believe beyond a reasonable doubt that [Appellant]
committed such other offense, if any was committed, and then you may only
consider the same in determining the credibility of [Appellant] in
connection with the offense, if any, alleged against him in the indictment
in this case and for no other purpose.

 

[Emphasis added.]








Appellant is correct in that,
because he did not testify at trial, his credibility as a witness was not a
contested issue.  Cf. Tex. R. Evid. 404.  A correct extraneous offense limiting
instruction would have made reference to one of the proper purposes for which
such evidence could be used under the facts of this case.  See id.  Appellant did not request any limiting
instructions at the time any of the extraneous offense evidence was admitted,
so the evidence was admitted for all proper purposes.  See Hammock v. State, 46 S.W.3d
889, 895 (Tex. Crim. App. 2001) (stating that without request for a limiting
instruction at the time evidence is admitted, evidence is admitted for all
purposes); see also Tex. R. Evid.
404(a) (stating that evidence of conformity is not admissible without meeting
one of the exceptions).

We hold that the trial court
erred by charging the jury that any extraneous offense testimony could be
considered in determining Appellant=s credibility in connection with the offenses.  Because Appellant=s credibility was erroneously placed in issue, we must evaluate
whether the trial court=s
instruction caused egregious harm.  See
Abdnor, 871 S.W.2d at 731.

Egregious Harm

In making an Aegregious harm@
determination, Athe actual
degree of harm must be assayed in light of the entire jury charge, the state of
the evidence, including the contested issues and weight of probative evidence,
the argument of counsel and any other relevant information revealed by the
record of the trial as a whole.@  Almanza, 686 S.W.2d at
171; see generally Hutch, 922 S.W.2d at 172‑74.  The purpose of this review is to illuminate
the actual, not just theoretical, harm to the accused.  Almanza, 686 S.W.2d at 174.  Egregious harm is a difficult standard to
prove and must be determined on a case‑by‑case basis.  Ellison v. State, 86 S.W.3d 226, 227
(Tex. Crim. App. 2002); Hutch, 922 S.W.2d at 171.  Errors resulting in egregious harm are those
that affect the very basis of the case, deprive the defendant of a valuable
right, or vitally affect a defensive theory. 
Hutch, 922 S.W.2d at 171.








Entire Jury Charge

Appellant asserts that,
because he did not testify, Ato the extent that this instruction could be characterized as inviting
the jury to weigh Appellant=s >credibility= as a witness, it amounted to an improper invitation to consider
Appellant=s assertion
of his Fifth Amendment privilege as a circumstance against him.@  Appellant also complains that
the challenged instruction was akin to an improper comment on the weight of the
evidence.

With regard to comment or
invitation to consider a defendant=s failure to testify, the offending language must be viewed from the
jury=s standpoint, and the implication that the comment referred to the
defendant=s failure to
testify must be clear.  See Bustamante
v. State, 48 S.W.3d 761, 764‑65 (Tex. Crim. App. 2001).  It is not sufficient that the language might
be construed as an implied or indirect allusion; the test is whether the
language used was manifestly intended or was of such a character that the jury
would necessarily and naturally take it as a comment on the defendant=s failure to testify.  Id.
at 765.  In applying this standard, the
context in which the comment was made must be analyzed to determine whether the
language used was of such character.  Id.








The challenged language, Ain determining the credibility of [Appellant] in connection with the
offense,@ does not direct the jury=s attention to Appellant=s failure to testify or appear to be of such a character that the jury
would necessarily and naturally take it as a comment on his failure to
testify.  Id.  In contrast, the paragraph immediately
preceding the challenged instruction provided,

In a
criminal case the law permits a defendant to testify in his own behalf but he
is not compelled to do so, and the same law provides that the fact that a
defendant does not testify shall not be considered as a circumstance against
him.  You will, therefore, not consider
the fact that the defendant did not testify as a circumstance against him; and you
will not, in your retirement to consider your verdict, allude to, comment on,
consider, or in any manner refer to the fact that the defendant has not
testified. 

 








The remainder of the jury instructions consisted
of the charges; the substantive law; definitions of the offenses at issue; and
explanations of what the State had and did not have to prove,[11]
how to apply the law to any facts that they found beyond a reasonable doubt,
the presumption of innocence, that the indictment did not constitute evidence
of guilt, and how to communicate with the trial court.  The trial court also gave the customary instruction
that the jurors were the exclusive judges of the facts proved, the credibility
of the witnesses, and the weight to be given to the testimony.

On appeal, we generally
presume that the jury follows the trial court=s instructions in the manner presented.  Thrift v. State, 176 S.W.3d 221, 224
(Tex. Crim. App. 2005).  To rebut this
presumption, the appellant must point to evidence that the jury failed to do
so.  Id.  Here, the jury=s attention was not directly focused by the challenged instruction on
Appellant=s failure to
testify, and the jury received an explicit instruction not to consider
Appellant=s failure to
testify.  As there is nothing in the
record to indicate that the jury failed to follow the trial court=s express instruction not to consider Appellant=s failure to testify, and Appellant himself has directed us to no
evidence to show otherwise, we conclude that the challenged instruction did not
constitute an improper invitation to consider his failure to testify when
considered in light of the entire charge. 
See Bustamante, 48 S.W.3d at 764‑65.








Turning to Appellant=s argument that the instruction constituted a comment on the weight of
the evidence, we consider the court=s charge as a whole when determining whether an instruction is such a
comment.  Russell v. State, 749
S.W.2d 77, 79 (Tex. Crim. App. 1988).  An
instruction constitutes a comment on the weight of the evidence if it furnishes
a standard by which the jury should weigh the testimony or if it authorizes the
jury to act arbitrarily in passing on the credibility of a witness.  Id.

Reviewed in light of the
whole charge, including the general instruction that the jury was the exclusive
judge of the credibility of the witnesses and the weight to be given to their
testimony, and when examined in light of the evidence presented at trial,
addressed in more detail below, we conclude that the complained-of instruction
provided no comment on the weight of the evidence.  See id.  The instruction itself constituted a nullity
because Appellant did not testify. 
Because he did not testify, the jury was unable to interpret the
instruction as the trial judge=s personal opinion as to truth or falsity of any evidence directly
provided by Appellant, or a comment on his credibility.  See id. at 78.  We will continue to consider whether the
impact of this null instruction constituted egregious harm within our analysis
below of the evidence presented at trial.

State Of The Evidence

Contested Issues 








The contested issues at trial
pertained to Appellant=s guilt with
regard to committing the offenses of aggravated sexual assault of a child and
indecency with a child with the complainant, B.L., alleged to have been
committed on or about July 12, 2003, and bail jumping.  We have already addressed the sufficiency of
the evidence provided by the State with regard to bail jumping.

To prove the three aggravated
sexual assault charges, the State had to bring forth evidence for the jury to
find beyond a reasonable doubt that Appellant had intentionally or knowingly
caused the penetration of B.L.=s sexual organ by inserting his finger into her female sexual organ,
caused the penetration of B.L.=s mouth by Appellant=s sexual organ, and caused B.L.=s sexual organ to contact Appellant=s sexual organ, and that B.L. was younger than fourteen when Appellant=s conduct occurred.  See Tex. Penal Code Ann. ' 22.021(a)(1)(B)(i)-(iii), (2)(B).  To prove the two indecency charges, the State
had to bring forth evidence for the jury to find beyond a reasonable doubt that
Appellant had engaged in sexual contact with B.L. by touching any part of B.L.=s genitals and by exposing his genitals to her with intent to arouse
or gratify his sexual desire, that B.L. was younger than 17 years old when
Appellant=s conduct
occurred, and that B.L. was not his spouse. 
See id. ' 21.11.

Evidence At Trial








The testimony at trial
centered primarily around events during the spring and summer of 2003, when
B.L. was twelve years old.  During the
State=s case-in-chief, B.L.=s aunt, Delia Heizer, the outcry witness, testified that B.L. told her
in July 2003 Athat there
was this man who she loved and he loved her,@ that they had had a sexual relationship, that he had promised he
would marry her as soon as his wife died, and that it was clear that B.L. was
talking about Appellant.  B.L.=s mother testified that B.L. had never been married or married to
Appellant.








B.L. testified that she had
been friends with Appellant=s daughters, Jaime and Jasmin, that the first time she spent the night
at their house, Appellant gave her orange juice and vodka to drink, and that
she, Jasmin, and Appellant would drink alcohol together when she went over to
Appellant=s house at
night. She testified that, when asked by police on May 12, 2003, about drinking
alcohol at Appellant=s house and
whether Appellant had touched her inappropriately, she lied to the police.  But she also testified that prior to May 12,
there had been nothing more aggressive by Appellant than comments and touching
her bottom.[12]  She testified that after May 12, Appellant
promised to get her belly button pierced, something she wanted, and that he
started touching her more often and in more private places, including her
breasts Aevery time [she] was over there.@  She testified that she
performed oral sex on Appellant one night after Ahe pulled it out of his pants and told [her] to give him head,@ that Appellant penetrated her vagina with his penis one night after
he removed her shorts and underwear, and that Appellant penetrated her vagina
with his finger.

The State=s remaining witnesses during its case-in-chief were the Bedford police
detective who began investigating the offense in August 2003, Elaine Rosene,
another minor, and the Tarrant County deputy who retrieved Appellant from
Chicago in April 2005.  Elaine testified
that B.L. spent a lot of time at Appellant=s house, that Appellant served them alcohol one nightCshe received it in ice cream and B.L. received it in orange juiceCand that, after May 12, 2003, Elaine was no longer welcome at
Appellant=s
house.  Elaine made a complaint to the
police in May 2003 stating that she had witnessed Appellant and Jaime touching
inappropriately at Elaine=s house,
with Jaime=s hand
touching Appellant=s penis for ten
to fifteen minutes.[13]  Elaine testified that Jaime was unwilling to
report this.








Appellant=s witnesses included the Bedford police officer who took B.L.=s contradictory statements in May and in July 2003,[14]
B.L=s classmates Holly Mayhew, Anthony Cervantes, and Epiphany Bray, the
sexual assault nurse examiner, Appellant=s wife and daughters, two friends of the family, and Chris Marquez,
who had dated both B.L. and Jasmin.

Holly testified that B.L.
said B.L.=s father
raped her and that Epiphany was present when B.L. told her this.  Epiphany testified that Holly was present,
but that when Epiphany asked B.L. whether it was true that her father raped
her, B.L. replied, Ano, it was a
guy named Craig [Appellant=s first name].@  Epiphany elaborated that A[B.L.] said that it was one of her friend=s dad[].@  Anthony, who dated B.L. for around five
months, testified that B.L. told him that she had been raped by the father of a
different friend, Kayla.








The sexual assault nurse
examiner testified that B.L. told her during her medical history about the
vaginal intercourse and that A[Appellant=s]
16-year-old and his 11-year-old daughter had told her that he abused them also.@  She testified that B.L. did
not have a hymen, which indicated Achronic penetration@Cpenetration more than one timeCwhich she found inconsistent with B.L.=s statement.[15]  She also testified that she did not remember
asking B.L. about the inconsistency, that B.L. named Appellant, a white male,
age forty, as the culprit, and that B.L. seemed embarrassed, which she
testified was a common feature in her training and experience with adolescent
females.








Mainaz, Jasmin, and Jaime
testified in Appellant=s
defense.  Mainaz testified that B.L. told
her the first time she met her that B.L. had been sexually molested by her
father.[16]  Mainaz testified that when she found out that
Chris, then eighteen, was dating B.L., she called him to let him know that B.L.
was twelve. Chris then broke up with B.L., and Mainaz testified that this was
B.L.=s motivation to make her allegations against Appellant.  She also testified that two of Appellant=s friends did act inappropriately with minors, including B.L. She
reported this to the police several months after Appellant=s indictment, testifying that she took Jasmin to make a police report
as soon as she found out.  Mainaz
testified that Jaime=s depression
after May 2003 and into the school year of 2004 was because of Mainaz=s illness, and that Jaime did say, AI have access to a gun, I=ll kill myself,@ but A[a]ll theCmost kids do
that, they say that.@  Mainaz had been ill with hepatitis C and
started taking medication to treat it at the end of May 2003, which Aslowed [her] down.@  She also testified that
Appellant told her that he did not commit the crime and that he fled to India
because Athey were going to try to put him in prison for the rest of his life.@

Jaime denied making the
statement about a gun and testified that B.L. and Elaine were both liars and
that her father had never touched her. 
With regard to her suicidal thoughts, she testified that she Awas just going through a hard time, and [she] thought [her] life wasn=t going to get any better, and [her] mom was a little sick.@  Both Jaime and Jasmin
testified that B.L. told them that B.L.=s father abused her.[17]  Jasmin testified that she made milkshakes
with vanilla extract when Christine, Jaime, and Tara were at her house.








Tara Schweyher, a friend of
Jaime=s, testified that in 2002 or 2003 she spent the night at Appellant=s house with Jaime, Christine, B.L., and Elaine and that Jasmin made
milkshakes with vanilla extract that tasted bad.  Tara testified that B.L. told her that her
father had molested her.  Shalinta
Jean-Baptiste, Appellant=s oldest
daughter=s best friend, testified that she spent a lot of time at Appellant=s house in the summer of 2003 and never saw children drinking
alcoholic beverages there or Appellant act inappropriately around B.L., and that
B.L. Alied a lot.@  She also testified that one of Appellant=s friends, Shawn, did interact inappropriately with B.L.  Chris testified that he was eighteen when he
dated B.L. for around a week and broke up with her when Mainaz told him B.L.=s real age.

In rebuttal,
the State produced Christine, another minor, and Tammy Koolbeck.  Christine testified that she made a police
report in March 2002 and that she did not know B.L., but did know Elaine.  She testified that she had been friends with
Jaime and when she spent the night at Appellant=s house, Appellant gave her ice cream that tasted like it had alcohol
in it.  She testified that Appellant had
mentioned alcohol earlier that evening, asking them if they wanted any Abecause it wasn=t a party
without it.@  After the ice cream was served, Appellant
joined her, Jaime, and his son in a game of truth or dare. Christine testified
that Appellant dared her to take off her bra, to kiss his son, to run around
the swimming pool in her bra with her shirt off, and to lick the back of the
car.  She complied with all of the dares.








Koolbeck
testified that she had been Jaime=s guidance counselor and knew B.L., Elaine, and Tara.  She testified that Jaime=s parents were not very involved in Jaime=s academic life and that when Jaime commented to her that she was
suicidal in January 2004, although Koolbeck informed Mainaz, Mainaz did not
come to the school that day and Koolbeck had someone else=s parent agree to watch Jaime for twenty-four hours.  She also testified that as to Tara=s reputation for truthfulness at school, Atruthful would not be an adjective that we would use as a faculty,@ and that they had lots of trouble at school with lies.  In rebuttal, the defense brought Tara back to
testify that Christine was at Appellant=s house the night she was there and that Tara was not lying.

Weight Of Probative
Evidence








The jury, as
a rational trier of fact and the sole judge of the evidence=s weight and credibility, could have found the essential elements of
aggravated sexual assault and indecency beyond a reasonable doubt, based on the
testimony at trial.  See Jackson,
443 U.S. at 319, 99 S. Ct. at 2789; Hampton, 165 S.W.3d at 693; Margraves,
34 S.W.3d at 919.  The jury heard
testimony from B.L. that she was twelve years old when Appellant penetrated her
vagina with his finger and his penis and put his penis in her mouth.  See Tex.
Penal Code Ann. '
22.021(a)(1)(B)(i)-(iii), (2)(B).  The
jury also heard B.L. testify that Appellant frequently touched her breasts and
other private areas after May 12 and exposed his genitals to her before
demanding oral sex, and B.L.=s mother testified that B.L. had never been married to Appellant.  See id. ' 21.11.  If the jury chose to
believe B.L.=s testimony
beyond a reasonable doubt, after evaluating her demeanor and her credibility
in light of the testimony of all of the other witnesses, then this evidence
alone would have been sufficient to convict Appellant.  Johnson, 23 S.W.3d at 8.

The Argument Of Counsel 

After the
trial court read the charge to the jury, the State argued the motivation behind
each witness=s
testimony.  It argued that the motivation
behind Jasmin and Jaime=s testimony
was to keep their father from being convicted. 
It argued that Elaine received nothing but ridicule and interrogation
for reporting Appellant=s
interaction with Jaime and that Elaine=s testimony was true.  It argued
that Christine, who did not know B.L., had a similar experience the year before
and told the truth about it.  It argued
that B.L.=s testimony
should be believed, in spite of some of B.L.=s bad decisions in the past.








Appellant
countered by attacking the relevance and reliability of the testimonies by
Christine, Elaine, and B.L., stating that Christine and Elaine=s testimonies Adidn=t give us one bit of evidence that showed that [Appellant] did
anything to [B.L.].@  He attacked B.L.=s mother=s testimony
with regard to her ability to trust her daughter and B.L.=s aunt=s testimony
with regard to the actual information contained within B.L.=s outcry statement.  He argued
about the lack of investigation by the Bedford police and returned to B.L.=s credibility, stating, ACan you believe anything that girl said?@ and made reference to inconsistencies in B.L.=s testimony when contrasted with testimony from the nurse, the police
officer, and Elaine.

The State
closed with a review of the case=s timeline, starting with Christine=s testimony about similar events a year before, Elaine=s police statement in May, B.L.=s outcry in July and her rape examination in August, Jaime=s subsequent suicidal thoughts, the police report filed by Mainaz on
Appellant=s friend
with regard to B.L. seven months after Appellant was indicted, and Appellant=s flight to India.

Other Relevant
Information

Appellant
claims that his credibility was not an issue, such that the challenged
instruction was an improper invitation to consider his extraneous bad acts to
establish conformity with his bad character. 
He lists the following as the evidence of extraneous bad acts presented
at trial: Aroutinely
serving alcohol to minors, playing >truth or dare= in a
sexually explicit manner with Christine Benavides, and carrying on a sexual
relationship with his twelve year old daughter, [Jaime],@ and asserts that the instruction constituted an invitation to the
jury to consider this evidence Afor the purpose of establishing his bad character and his conformity
with that bad character.@








Rule 404(b)
provides that evidence of other crimes, wrongs, or acts is not admissible to
prove the character of a person in order to show conformity therewith.  Tex.
R. Evid. 404(b).  However, it may
be admissible for other purposes, such as proof of motive, opportunity, intent,
preparation, plan, knowledge, identity, or the absence of mistake or
accident.  Id.  Outside the jury=s presence, the State and Appellant argued the admissibility of
witnesses for the State and for the defense. 
With regard to the State=s witnesses, the State argued for the admissibility of testimony by
Christine and Elaine under the rule 404(b) exception for modus operandi,
intent, and motive.  See id.
Appellant=s defense
counsel argued to the trial court that Christine=s testimony was extraneous, and the trial court agreed at that time,
but it later allowed her testimony in rebuttal after the defense rested,
without objection.  Elaine=s testimony was allowed during the State=s case‑in‑chief.[18]

 

 

Analysis








The State=s argument to the jury mirrored its rule 404(b) theory to the trial
court with regard to the admissibility of Christine and Elaine=s testimonies under rule 404(b). 
Neither the State nor defense counsel addressed Appellant=s failure to testify on his own behalf during closing arguments.  Because there was no testimony by Appellant,
there was nothing for the jury to consider with regard to his credibility as a
witness.  Omitting the part of the
instruction that did not apply, the jury=s instruction read,

You are
instructed that if there is any testimony before you in this case regarding
[Appellant=s] having
committed an offense other than the offense alleged against him in the
indictment in this case, you cannot consider said testimony for any purpose
unless you find and believe beyond a reasonable doubt that the defendant
committed such other offense, if any was committed, and then you may only
consider the same in determining the credibility of [Appellant] in connection
with the offense, if any, alleged against him in the indictment in this case
and for no other purpose.








Nothing in the plain language
of the instruction makes any reference to conformity and bad character.  The State=s closing argument drew parallels between Christine and Elaine=s testimonies as demonstrations of modus operandi and intent, but not
to Appellant=s bad
character.  And the jury also received
the customary instruction that it was the exclusive judge of the facts proved,
the credibility of the witnesses, and the weight to be given to the testimony,
and, presumably, applied this instruction to the testimony of the witnesses
brought before it.  See Thrift,
176 S.W.3d at 224.  To rebut this presumption,
Appellant must have directed us to evidence in the record that the jury failed
to do so, and he has not.[19]  See id.

AEgregious@ harm is
present when the case for conviction was actually made clearly and
significantly more persuasive by the error. 
See Saunders v. State, 817 S.W.2d 688, 692 (Tex. Crim. App.
1991).  While the testimony of Christine
and Elaine might have warranted the request for a limiting instruction by
Appellant, his defense counsel made none. 
While Christine and Elaine=s testimony may have made it more likely for the jury to conclude, per
the State=s closing
argument, that Appellant=s modus
operandi involved giving alcohol to minors, and that Appellant=s intent was to have sexual contact with minors, we cannot say that it
was clearly and significantly more persuasive than B.L.=s direct testimony, which, if believed by the jury, would have been
legally and factually sufficient to convict Appellant of aggravated sexual
assault and indecency with a child.  See
Saunders, 817 S.W.2d at 692; see also Margraves, 34 S.W.3d at 919; Johnson,
23 S.W.3d at 8.








Upon
comprehensive review of the record, we conclude that the instruction was an
inconsistency that created a null instruction to the jury in light of the
entire charge, and did not affect the very basis of Appellant=s case, i.e., his guilt or innocence in light of all of the evidence,
or deprive him of a valuable right, i.e., the privilege against
self-incrimination, or affect any defensive theory, i.e., that Appellant was
not guilty and that the complainant was a liar. 
See Hutch, 922 S.W.2d at 171. 
Therefore, though the instruction was error, it did not cause the
egregious harm that would require reversal. 
See Abdnor, 871 S.W.2d at 731; Almanza, 686 S.W.2d at
171.  We overrule his final point.

CONCLUSION

Having
overruled all of Appellant=s points, we affirm the trial court=s judgment.

 

DIXON W. HOLMAN

JUSTICE

 

PANEL A:  CAYCE, C.J.; HOLMAN
and GARDNER, JJ.

 

DO NOT PUBLISH

Tex. R. App. P. 47.2(b)

 

DELIVERED:  June 28, 2007











[1]See Tex.
R. App. P. 47.4.





[2]Tex. Penal
Code Ann. ' 21.11 (Vernon 2003 & Supp.
2006) (indecency with a child); id. ' 22.021(a)(1)(B)(i)-(iii), (2)(B) (aggravated sexual
assault of a child); id. ' 38.10(a) (bailjumping).





[3]Based on the trial docket, it would
appear that there were actually two mistrials. 
The first, on May 16, 2005, was declared without explanation in the
record after pretrial motions were heard. 
The second, on May 19, 2005, was declared due to a hung jury.





[4]Crow added, AWe usually have one posted in our
office on the wall.@ 
The trial court recessed briefly to allow Crow the opportunity to check
for a posting on the wall of Crow=s office.  No further
testimony was given about the wall posting.





[5]He also testified that Appellant
had been carrying one suitcase containing personal items, a computer, and
approximately five thousand dollars.





[6]Mainaz testified that Appellant
told her that he did not commit the crime Aand they were going to try to put him in prison for the
rest of his life.@





[7]AThe jury is instructed that the
Court has taken judicial notice that Cause No. 0915900 was set for jury trial
on March 29, 2005.  The jury is further
instructed that it may but is not required to accept as conclusive, the fact
judicially noticed.@





[8]Under the Texas Rules of Evidence,
a judicially noticed fact must be one not subject to reasonable dispute in that
it is either (1) generally known within the territorial jurisdiction of the
trial court or (2) capable of accurate and ready determination by resort to
sources whose accuracy cannot reasonably be questioned.  Tex.
R. Evid. 201(b). 





[9]April 4, 2005 is stamped
with ATrial Docket@ on the trial docket sheet. With
regard to the date Aon or about@ in an indictment, in which the
indictment alleges an offense to have been committed, the State is not bound by
that date as long as that date is anterior to the presentment of the indictment
and not so remote that the prosecution of the offense is barred by
limitation.  Tex. Code Crim. Proc. Ann. art. 21.02, ' 6 (Vernon 1989) (stating the
requisites of an indictment); Mitchell v. State, 330 S.W.2d 459, 462
(Tex. Crim. App. 1959).      Appellant=s indictment for bail jumping
stated that, Aon or about the 29th day of March
2005,@ after being lawfully released from
custody on the pending aggravated sexual assault charge on the condition that
he subsequently appear in court, that Appellant intentionally or knowingly
failed to appear in accordance with those terms, specifically, that Appellant
was Aordered to appear for trial on or
about the 29th day of March, 2005 and . . . fled the State of Texas and
failed to appear for said trial.@  [Emphasis
added.]  Appellant was indicted by grand
jury of the bail jumping charge in May 2005.





[10]Because we overrule these two
points, we need not address Appellant=s related sub-point, in which he contends that his other
convictions should be reversed because A[t]he bail jumping case was an extraneous offense with
regard to the child sex offenses alleged in cause number 915900D,@ supported by insufficient
evidence.  Tex. R. App. P. 47.1.





[11]For example, with regard to the
sexual offense charges, the trial court instructed the jury that 

the State is not required to prove the exact date alleged in the
indictment, but may prove the offenses, if any, to have been committed at any
time prior to the presentment of the indictment so long as said indictment is
presented within ten years of the 18th birthday of the victim of the offense.





[12]B.L. testified that Appellant=s comments included statements that
he loved her and he wanted to marry her and that he would marry her when his
wife died.  She testified that he also
told her Athat he would rather make love to
me than just have sex.@ 
She testified that she had a crush on him and that she believed that he
was going to marry her when his wife died.





[13]Elaine testified that she had been
staying at Appellant=s house when her father was out of
town and they had taken her to her house to feed the cats. 





[14]B.L. told the officer on July 28
that she had been provided alcohol, Athe complete opposite of what she told [her] on the 12th
[of May].@





[15]She testified that she wrote down
that it was inconsistent A[b]ecause I don=t think she told me that it was
that she had any penile/vagina penetration that many times for her hymen to be
worn@ and she felt that B.L. was
untruthful about the amount of times that she was penetrated.





[16]Mainaz testified that she did not
report this to the police because she said B.L. told her that the police had
already been called and that her mother knew about it.





[17]Jaime testified that B.L. said that
B.L.=s father raped her, while Jasmin
testified that B.L. said that he abused her, but did not tell her that B.L.=s father had sexually abused her.





[18]Appellant does not complain on
appeal about the actual admission of the extraneous offense evidence or the
absence of a proper limiting instruction in the jury charge.  He only complains about the language used in
the actual limiting instruction.





[19]This presumption does not apply to
proving harm from error, because neither the State nor Appellant has the burden
to prove harm from charge error.  Ovalle
v. State, 13 S.W.3d 774, 787 (Tex. Crim. App. 2000).  Instead, it is our duty to assess harm from
the context of the error.  Id.  However, the party making the argument still
must suggest, in light of the record, how prejudice may or may not have
occurred and provide us with a clear and concise argument for the contentions
made, with appropriate citations to authorities and to the record.  Tex.
R. App. P. 38.1(h); Ovalle, 13 S.W.3d at 787.